**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0027n.06

Case Nos. 17-6469/17-6524

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| NTCH-WEST TENN, INC., | ) | **FILED**<br>Jan 16, 2019<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Plaintiff-Appellant,/Cross-Appellee, | ) |  |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE WESTERN DISTRICT OF |
| ZTE CORPORATION, | ) | TENNESSEE |
|  | ) |  |
| Defendant-Appellee,/Cross-Appellant. | ) |  |
|  | ) |  |

BEFORE: KEITH, COOK, and LARSEN, Circuit Judges.

COOK, Circuit Judge. Plaintiff NTCH-West Tenn, Inc. ("NTCH-TN"), an American cellular network operator, sought recovery from defendant ZTE Corporation ("ZTE Corp."), a Chinese network equipment manufacturer in federal court in Tennessee. The district court dismissed Plaintiff's diversity action, finding that NTCH-TN failed to establish a prima facie basis for the court to exercise specific jurisdiction over Chinese defendant ZTE Corp. NTCH-TN now appeals that determination. For the reasons explained here, we AFFIRM.

**I.**

This is a case about jurisdiction. It involves unsuccessful and prolonged business ventures, numerous corporate partners and affiliates, and a foreign defendant. But at bottom, the appeal

concerns a simple question: Did NTCH-TN establish sufficient facts supporting the exercise of personal jurisdiction over Chinese defendant ZTE Corp.?

ZTE Corp. used its wholly-owned American subsidiary and sales-arm, ZTE USA, to sell cellphone network equipment to Tennessee plaintiff NTCH-TN's Florida-based affiliate, PTA-FLA. ZTE USA signed a purchase agreement with PTA-FLA requiring the American subsidiary to install ZTE Corp.-manufactured equipment and provide support services for a cell phone network in Florida. The agreement—to which neither NTCH-TN nor ZTE Corp. was party—marked the start of an ultimately unproductive venture.

Soon after installation, PTA-FLA realized the equipment failed to meet U.S. regulations and could not function without causing disruption. Bypassing the American subsidiary, PTA-FLA complained directly to ZTE Corp., which assured PTA-FLA that it would fix the equipment. But when the network issues persisted, PTA-FLA decided to exit the Florida market, selling its network to a buyer who conditioned its purchase on PTA-FLA's removal of ZTE Corp.'s malfunctioning equipment.

Looking to mitigate its losses, PTA-FLA arranged for NTCH-TN to install the ZTE equipment in Tennessee. Installation commenced on ZTE Corp.'s assurance that it would fix the equipment for NTCH-TN's use there. But when NTCH-TN deployed the equipment, it experienced the same network malfunctions that PTA-FLA had confronted in Florida. Once again, the Chinese manufacturer promised NTCH-TN a fix, this time sending China-based engineering teams to Tennessee to attempt repairs. When the engineers failed to fix the problem, NTCH-TN decided to abandon use of the defective equipment. ZTE Corp. later "acknowledged that the ZTE [e]quipment was merely a platform for experimentation in the American market" and never intended for commercial use.

NTCH-TN sued ZTE Corp. alleging various state law claims, including breach of contract, fraudulent misrepresentation, tortious interference with contract, and unjust enrichment. ZTE Corp. moved for the court to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). In support, ZTE Corp. proffered a declaration from its legal director stating that ZTE Corp. never entered into a contract with, received purchase orders from, or delivered equipment to NTCH-TN. The declaration also stated that "[a]t ZTE USA's request, ZTE Corporation provided service support to ZTE USA in Tennessee on three occasions in 2009. In total, ZTE Corporation sent two employees to Tennessee to provide such service support to ZTE USA." ZTE Corp.'s other submissions confirmed that NTCH-TN contracted with ZTE USA, rather than ZTE Corp.

ZTE Corp.'s submission of affidavits shifted NTCH-TN's burden of proof. Now, though NTCH-TN still needed to "make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal," *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 548–49 (6th Cir. 2016) (quoting *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007)), it could not rely on its complaint to do so—it had to "by affidavit or otherwise, set forth specific facts showing that the court ha[d] jurisdiction" over ZTE Corp. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). So NTCH-TN proffered the declaration of Development Manager Eric J. Steinmann (the "Declaration"), its representative in negotiations with ZTE USA. NTCH-TN relied on the following portions to support personal jurisdiction:

> ¶5.    ZTE Corp[.] manufactures and supplies telecommunications equipment, hardware, related software, and related support services to United States markets.
>
> ¶6.    ZTE Corp[.] equipment ships directly from China and requires ZTE Corp[.] engineers from China to develop software, and come to the United States to provide installation and commissioning support as well as trouble shooting software and hardware issues from China and deploying engineers on the ground in the United States.

¶7.     ZTE Corp[.] sent ZTE Corp[.] engineers from China to Tennessee on multiple occasions to provide support and repair ZTE Corporation equipment.

¶8.     ZTE Corp[.] promised that its equipment would meet United States standards, which include UL certification.

¶9.     ZTE Corp[.] did not meet UL certification standards and attempted to fraudulently put UL stickers on ZTE Equipment in China. A ZTE USA employee told ZTE Corp[.] that this was improper and the stickers should not be placed on the equipment.

¶10.    The engineers from China that ZTE Corp[.] sent to Tennessee were unable to repair or make functional all network capabilities and NTCH-TN eventually was required to engage a third-party to make certain capabilities functional. This cost was not planned for in NTCH-TN's budget.

¶11:    ZTE Corp[.] employees assured NTCH-TN that it would be capable of remedying the prior problems with the ZTE equipment and make sure the network fully functioned with all [U.S.] regulatory requirements being met.

¶12.    ZTE Corp[.] was either incapable or unwilling to make the network in Tennessee fully functional.

After evaluating the Steinmann Declaration, the district court found its facts insufficient to support NTCH-TN's argument that ZTE Corp. purposefully availed itself of the privilege of conducting business in Tennessee, such that a district court sitting in Tennessee would have specific jurisdiction over the Chinese corporation.  The district court therefore dismissed NTCH-TN's claims against ZTE Corp.

On appeal, NTCH-TN challenges that judgment and asserts that the district court improperly relied on ZTE Corp.'s version of disputed facts in coming to that conclusion.

**II.**

To support specific jurisdiction, NTCH-TN must make a prima facie showing that ZTE Corp.'s contacts with Tennessee "proximately result from actions by [ZTE Corp.] [it]self that create a 'substantial connection' with the forum State." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  That is, if ZTE Corp. engaged in significant activities in Tennessee or created continuing

contractual obligations between itself and residents of Tennessee, the Chinese manufacturer has availed itself of the privilege of conducting business with the benefits and protections of Tennessee law. *See MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 900 (6th Cir. 2017); *Burger King*, 471 U.S. 475–76 (1985).

According to NTCH-TN, ZTE Corp. purposefully availed itself of the benefits of Tennessee law in several ways: the Chinese manufacturer orally agreed with NTCH-TN to make the equipment functional in Tennessee, controlled ZTE USA's negotiations with NTCH-TN to move the equipment to Tennessee, and dispatched personnel to Tennessee to repair the equipment. Although the district court must read the Declaration in a light most favorably supporting NTCH-TN's version of events, it need not ignore undisputed facts or representations from ZTE Corp.'s submissions. *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 153 (6th Cir. 1997). To prevail on an argument that the district court erred in weighing the affidavits, NTCH-TN must show that the district court relied on ZTE Corp.'s version to negate facts in the Declaration. *Id*. (citing *Theunissen*, 935 F.2d at 1459).

## III.

### A.

The district court's review did not improperly countenance inconsistent facts from ZTE Corp.'s affidavits. Although NTCH-TN contends that the district court erred by ignoring facts tending to show jurisdiction—such as ZTE Corp.'s oral agreement with NTCH-TN, control over the negotiations to move ZTE Corp. equipment from Florida to Tennessee, and dispatch of China-based personnel to the installation sites in Tennessee—the court's opinion demonstrates that the court accepted all of the facts that the Steinmann Declaration substantiated, and looked to ZTE Corp.'s version only to fill in any gaps.

Take ZTE Corp.'s alleged oral promise to make the equipment work in Tennessee. R. 97-1, Steinmann Decl. ¶11, PageID 2289 ("ZTE Corp[.] employees assured NTCH-TN that it would be capable of remedying the prior problems with the ZTE Equipment and make sure the network fully functioned with all U.S. regulatory requirements being met."). The district court accepted the Declaration's point that ZTE Corp. formed "a separate, presumably oral, contract with NTCH-TN" by "promis[ing] to provide software support in China, equipment [. . .], and technical support in Tennessee in an attempt to fix the ZTE equipment and make the network functional . . . ." But the district court recognized that the existence of an oral contract alone did not answer the jurisdictional question. Instead, the question was "whether ZTE Corp. intended to create a continuing, ongoing relationship with the forum." This required the district court to look beyond NTCH-TN's assertion that an oral contract existed to determine the contours of the parties' relationship.

Similarly, NTCH-TN maintains that the court should have credited its evidence that ZTE Corp. itself negotiated the deal to move the equipment to Tennessee. But as the district court noted, the Declaration makes no mention of any ex ante negotiations. It picks up *after* the move, describing the back-and-forth between NTCH-TN and ZTE Corp. over repairs and installation of equipment already in Tennessee. Even then, the Declaration alleges only that the Chinese manufacturer would be "capable" of fixing prior equipment problems—not that "ZTE Corp[.] knowingly committed to the performance of actions in Tennessee," as NTCH-TN contends.

True, the Declaration established that ZTE Corp. sent its engineers from China to Tennessee "to provide support and repair [the] equipment." But NTCH-TN alleged only that ZTE Corp. deployed engineers on "multiple occasions." The court was well within its power to accept ZTE Corp.'s more specific representation that it sent personnel to Tennessee just three times in

2009, and that those engineers came at ZTE USA's request to support the subsidiary's work under its own agreement with NTCH-TN. The court cannot assume that ZTE Corp. engineers performed repairs under an independent contractual obligation to NTCH-TN when the Declaration fails to allege or substantiate that fact.

**B.**

The district court also found that NTCH-TN's proffer fell short of a prima facie showing of purposeful availment justifying specific jurisdiction. We agree.

NTCH-TN bore the burden of proving that ZTE Corp. purposefully availed itself of the privilege of conducting business within Tennessee, thus invoking the benefits and protections of Tennessee law. *See* Tenn. Code Ann. § 20-2-214(a)(6); *Harmer v. Colom*, 650 F. App'x 267, 272 (6th Cir. 2016) ("Tennessee's long-arm statute goes to the due process clause's limit."). But the Steinman Declaration does not satisfy NTCH-TN's burden. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011) ("[I]t is petitioner's purposeful contacts with [the forum State], not the United States, that alone are relevant."). Stating that ZTE Corp. engineers must travel to the United States to support equipment installation does not suffice. Similarly, ZTE Corp.'s promise that its equipment complies with U.S. regulations and industry standards, does not demonstrate that ZTE Corp. purposefully directed its activities at Tennessee.

NTCH-TN's proffer does establish some acts by ZTE Corp. that could, in some circumstances, create a substantial connection with Tennessee. For example, ZTE Corp. orally agreed that "it would be capable of remedying the prior [network] problems." But a contract with an out-of-state party does not automatically establish the sufficient minimum contacts with the forum because merely making a contract "does not mean that [one] purposefully availed itself of the 'benefits and protections' of [forum] law." *Kerry Steel*, 106 F.3d at 151. Instead, NTCH-TN

needed to show that ZTE Corp. set in motion an ongoing business relationship, rather than a "one-shot affair." *CompuServe Inc. v. Patterson*, 89 F.3d 1257, 1265 (6th Cir. 1996) (citation omitted). To that end, the district court correctly looked for a richer array of contacts—"prior negotiations, contemplated future consequences, the terms of [a] contract, and the actual course of dealing"— that could have shown some "future consequences" as "the real object of the business transaction." *Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 910 (6th Cir. 1988). For example, in *Burger King* the Supreme Court held that a district court in Florida had jurisdiction over a Michigan resident because he "deliberately 'reach[ed] out'" and "negotiated with a Florida corporation for the purchase of a long-term franchise" there. *Burger King*, 471 U.S. at 479–80 (citation omitted); *see also Air Prods.*, 503 F.3d at 551.

By the same token, ZTE Corp. engineers traveled "to Tennessee on multiple occasions to provide support and repair . . . equipment," but this physical entry, "certainly a relevant contact," *Schmuckle*, 854 F.3d at 900, does not satisfy NTCH-TN's burden to show that ZTE Corp. intended to forge an ongoing business relationship with NTCH-TN in Tennessee. Had the Declaration included evidence that ZTE Corp. contemplated stationing its software developers in Tennessee or regularly dispatching engineers to maintain the equipment, these allegations could have supported specific jurisdiction. Instead, NTCH-TN offers evidence of a lone oral agreement with ZTE Corp. and a general allegation that ZTE Corp. engineers traveled to the state on multiple occasions. These "occasional acts" borne out in the Declaration create only an "attenuated" affiliation with Tennessee that do not support exercising jurisdiction. *See Burger King*, 471 U.S. at 475 n.18 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)). Absent evidence of an ongoing business relationship, the district court properly determined that it lacked jurisdiction over ZTE Corp.

**IV.**

Construed in the light most favorable to it, NTCH-TN proffers insufficient facts to make a prima facie showing that ZTE Corp.'s connections with Tennessee are substantial enough that it should reasonably have anticipated being haled into court there. *See CompuServe, Inc.*, 89 F.3d at 1264 (6th Cir. 1996). Further, NTCH-TN fails to demonstrate that the district court improperly construed facts in favor of movant ZTE Corp. Because NTCH-TN failed to support its allegations that ZTE Corp. intended an ongoing relationship with Tennessee or its residents, we agree with the judgment of the district court that this one-off deal cannot underpin purposeful availment, AFFIRM the district court's dismissal for lack of personal jurisdiction, and DISMISS defendant's cross-appeal as moot.